**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| VONMARIE THOMAS, Derivatively on Behalf of SNAP INC., <br><br> Plaintiff, <br><br> v. <br><br> EVAN SPIEGEL, DEREK ANDERSEN, JEREMI GORMAN, REBECCA MORROW, JERRY HUNTER, JARED, GRUSD, MICHAEL J. O'SULLIVAN, ROBERT MURPHY, MICHAEL LYNTON, KELLY COFFEY, JOANNA COLES, LIZ JENKINS, STANLEY MERESMAN, SCOTT D. MILLER, POPPY THORPE, and FIDEL VARGAS, <br><br> Individual Defendants, <br> -and- <br><br> SNAP INC., a Delaware corporation, <br><br> Nominal Defendant. | ) ) ) ) ) )  Case No. ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |

## VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

Plaintiff Vonmarie Thomas ("Plaintiff"), by her attorneys, submits this Verified Stockholder Derivative Complaint for violations of securities laws, breach of fiduciary duty, unjust enrichment, and insider trading. Plaintiff alleges the following upon information and belief, except as to the allegations specifically pertaining to Plaintiff, which are based on personal knowledge. This complaint is also based on the investigation of Plaintiff's counsel, which included, among other things, a review of public filings with the U.S. Securities and Exchange Commission ("SEC") and a review of news reports, press releases, and other publicly available sources.

## NATURE AND SUMMARY OF THE ACTION

1.      This is a stockholder derivative action brought by Plaintiff on behalf of Nominal Defendant Snap Inc. ("Snap" or the "Company") against members of its board of directors (the "Board") and members of upper management. The wrongdoing alleged herein has caused substantial damage to Snap's reputation, goodwill, and standing in the business community and has exposed Snap to substantial potential liability for violations of federal securities laws and the costs associated with defending itself. The violations of the law outlined herein have damaged Snap in the form of, among other things, millions of dollars in losses to the Company's market capitalization.

2.      This action seeks to remedy wrongdoing committed by Snap's directors and officers from July 22, 2020 through the present (the "Relevant Period").

3.       In June 2020, Apple Inc. ("Apple") publicly announced new data privacy features for iOS, the mobile operating system which it developed and maintains for its iPhone mobile devices.

4.      Following this announcement, Snap continuously downplayed the potential impact of Apple's new data privacy features, misleading investors about the extent to which the new features would likely affect the Company's business.

5.      Apple released the new data privacy features for iOS in April 2021.

6.      On October 22, 2021, Snap reported its financial results for the third quarter of 2021, announcing weaker-than-expected revenue and guidance attributable to its advertising business, which was negatively affected by Apple's privacy adjustments. Specifically, the Company belatedly disclosed that the iOS update issued by Apple in April imposed heightened restrictions on Snap's access to and use of user data, which ultimately reduced demand and pricing for the Company's advertising products.

2

7.     On this news, Snap's stock price fell approximately 26% per share to close at $55.14 on October 22, 2021, down from a closing price of $75.11 the previous day.

8.     The Individual Defendants breached their fiduciary duties by failing to correct and/or causing the Company to fail to correct its materially false and misleading statements and omissions regarding the impact of Apple's privacy adjustments on Snap's advertising business.

9.     As detailed herein, and as alleged in the ongoing federal securities class action in the Central District of California styled *Black v. Snap Inc., et al.*, No. 2:21-cv-08892-GW-PD (the "Federal Securities Class Action"), Snap's officers and directors substantially damaged the Company by filing false and misleading statements that omitted material adverse facts.

## JURISDICTION AND VENUE

10.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise federal questions under Section 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b), 78t(a) and 78t-1). This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

11.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that would not otherwise have such jurisdiction.

12.     Venue is proper in this District because Snap is incorporated in this District, and the Defendants' activities have had an effect in this District.

## THE PARTIES

### Plaintiff

13.     Plaintiff Vonmarie Thomas is and has continuously been a stockholder of Snap during the wrongdoing complained of herein.

### Nominal Defendant

14.     Nominal Defendant Snap is a Delaware corporation with its principal executive

3

offices located at 3000 31st Street, Santa Monica, California 90405. Snap's shares trade on the

New York Stock Exchange under the ticker symbol "SNAP."

**The Individual Defendants**

*Executive Defendants*

15.     Defendant Evan Spiegel ("Spiegel") is a co-founder of Snap and has served as the

Company's CEO and as a member of the Board since May 2012. During the Relevant Period,

Spiegel made the following sales of stock on the basis of material, non-public information:

| Date | Shares Sold | Price | Proceeds |
|---|---|---|---|
| 9/1/20 | 2,263,735 | $22.27 | $50,413,378.45 |
| 9/2/20 | 2,173,414 | $23.04 | $50,754,458.56 |
| 3/1/21 | 1,542,228 | $64.87 | $100,457,053.36 |
| 4/26/21 | 250,000 | $60.63 | $15,157,500.00 |
| 6/2/21 | 336,689 | $61.77 | $20,797,279.53 |
| 6/2/21 | 67,095 | $62.64 | $4,202,830.80 |
| 6/3/21 | 176,846 | $60.58 | $10,713,330.68 |
| 6/3/21 | 230,437 | $61.67 | $14,211,049.79 |
| 6/3/21 | 1,217 | $62.02 | $75,478.34 |
| 6/4/21 | 411,250 | $60.80 | $25,004,000.00 |
| 6/7/21 | 414,781 | $60.27 | $24,998,850.87 |
| 6/8/21 | 215,446 | $60.69 | $13,075,417.74 |
| 6/8/21 | 193,429 | $61.65 | $11,924,897.85 |
| 6/11/21 | 88,015 | $65.01 | $5,721,855.15 |
| 6/14/21 | 383,602 | $65.17 | $24,999,342.34 |
| 6/23/21 | 384,660 | $65.05 | $25,022,133.00 |
| 6/24/21 | 312,470 | $67.26 | $21,016,732.20 |
| 6/24/21 | 58,680 | $67.90 | $3,984,372.00 |
| 6/25/21 | 257,886 | $67.32 | $17,360,885.52 |
| 6/25/21 | 112,074 | $68.16 | $7,638,963.84 |
| 7/6/21 | 213,325 | $70.02 | $14,937,016.50 |
| 7/23/21 | 161,100 | $74.63 | $12,022,893.00 |
| 7/23/21 | 125,575 | $75.55 | $9,487,191.25 |
| 7/23/21 | 39,900 | $76.73 | $3,061,527.00 |
| 7/23/21 | 5,512 | $77.80 | $428,833.60 |
| 7/26/21 | 187,412 | $75.64 | $14,175,843.68 |
| 7/26/21 | 56,292 | $76.35 | $4,297,894.20 |
| 7/26/21 | 84,211 | $77.50 | $6,526,352.50 |
| 7/27/21 | 300,963 | $75.35 | $22,677,562.05 |
| 7/27/21 | 30,500 | $76.12 | $2,321,660.00 |
| 7/28/21 | 159,797 | $73.14 | $11,687,552.58 |

| 7/28/21 | 160,877 | $74.23 | $11,941,899.71 |
| 7/28/21 | 18,361 | $74.73 | $1,372,117.53 |
| 7/29/21 | 232,141 | $75.33 | $17,487,181.53 |
| 7/29/21 | 98,793 | $76.07 | $7,515,183.51 |
| 7/30/21 | 332,900 | $75.10 | $25,000,790.00 |
| 8/2/21 | 314,300 | $75.03 | $23,581,929.00 |
| 8/4/21 | 333,270 | $75.01 | $24,998,582.70 |
| 8/5/21 | 316,696 | $75.40 | $23,878,878.40 |
| 8/5/21 | 14,739 | $76.14 | $1,122,227.46 |
| 8/6/21 | 120,650 | $76.42 | $9,220,073.00 |
| 8/6/21 | 29,045 | $77.65 | $2,255,344.25 |
| 8/10/21 | 312,113 | $80.10 | $25,000,251.30 |
| 9/23/21 | 77,215 | $80.01 | $6,177,972.15 |
| 9/24/21 | 311,904 | $80.15 | $24,999,105.60 |
| 9/27/21 | 211,845 | $81.25 | $17,212,406.25 |
| 9/27/21 | 94,677 | $82.25 | $7,787,183.25 |
| | | **TOTAL PROCEEDS:** | **$777,613,539.02** |

16.     Defendant Derek Andersen ("Andersen") has served as Snap's CFO since May 2019. During the Relevant Period, Andersen made the following sales of stock on the basis of material, non-public information:

| Date | Shares Sold | Price | Proceeds |
| --- | --- | --- | --- |
| 8/17/20 | 6,082 | $21.83 | $132,770.06 |
| 9/15/20 | 23,659 | $24.39 | $577,043.01 |
| 9/16/20 | 5,000 | $24.95 | $124,750.00 |
| 10/15/20 | 6,082 | $27.05 | $164,518.10 |
| 11/16/20 | 56,082 | $39.03 | $2,188,800.46 |
| 12/15/20 | 23,659 | $51.80 | $1,225,536.20 |
| 1/15/21 | 5,676 | $50.50 | $286,638.00 |
| 2/16/21 | 5,676 | $62.49 | $354,693.24 |
| 3/15/21 | 22,082 | $62.18 | $1,373,058.76 |
| 4/15/21 | 4,865 | $62.62 | $304,646.30 |
| 5/17/21 | 4,865 | $52.66 | $256,190.90 |
| 6/15/21 | 18,928 | $63.20 | $1,196,249.60 |
| 7/15/21 | 4,054 | $61.81 | $250,577.74 |
| 8/16/21 | 4,054 | $74.09 | $300,360.86 |
| 9/15/21 | 15,773 | $70.80 | $1,116,728.40 |
| 10/15/21 | 4,055 | $76.76 | $311,261.80 |
| | | **TOTAL PROCEEDS:** | **$10,163,903.43** |

17.     Defendant Jeremi Gorman ("Gorman") has served as Snap's Chief Business

Officer since November 2018. During the Relevant Period, Gorman made the following sales of stock on the basis of material, non-public information:

| Date | Shares Sold | Price | Proceeds |
|------|-------------|-------|----------|
| 8/17/20 | 41,696 | $21.86 | $911,474.56 |
| 8/19/20 | 15,555 | $21.71 | $337,699.05 |
| 9/17/20 | 16,019 | $24.29 | $389,101.51 |
| 10/19/20 | 15,924 | $28.30 | $450,649.20 |
| 11/18/20 | 15,415 | $39.25 | $605,038.75 |
| 12/17/20 | 15,853 | $52.70 | $835,453.10 |
| 1/20/21 | 15,792 | $50.65 | $799,864.80 |
| 2/17/21 | 15,914 | $62.07 | $987,781.98 |
| 3/17/21 | 15,554 | $60.82 | $945,994.28 |
| 4/19/21 | 15,271 | $60.18 | $919,008.78 |
| 5/18/21 | 15,779 | $54.17 | $854,748.43 |
| 6/17/21 | 15,595 | $60.20 | $938,819.00 |
| 7/19/21 | 15,239 | $58.34 | $889,043.26 |
| 8/18/21 | 13,145 | $71.44 | $939,078.80 |
| 9/17/21 | 13,567 | $72.96 | $989,848.32 |
| 10/19/21 | 13,206 | $75.09 | $991,638.54 |
| | | **TOTAL PROCEEDS:** | **$12,785,242.36** |

18.     Defendant Rebecca Morrow ("Morrow") has served as Snap's Chief Accounting Officer since September 2019.

19.     Defendant Jerry Hunter ("Hunter") has served as the Company's Senior Vice President, Engineer since 2017 and previously served as Vice President of Core Engineering since October 2016. During the Relevant Period, Hunter made the following sales of stock on the basis of material, non-public information:

| Date | Shares Sold | Price | Proceeds |
|------|-------------|-------|----------|
| 8/19/20 | 61,147 | $21.67 | $1,325,055.49 |
| 10/19/20 | 7,721 | $28.30 | $218,504.30 |
| 11/18/20 | 60,859 | $39.81 | $2,424,229.95 |
| 1/20/21 | 7,609 | $50.53 | $384,482.77 |
| 2/17/21 | 33,639 | $61.79 | $2,078,553.81 |
| 4/19/21 | 10,023 | $60.33 | $604,687.59 |
| 5/18/21 | 33,630 | $54.52 | $1,833,507.60 |
| 7/19/21 | 10,024 | $58.36 | $585,000.64 |
| 8/18/21 | 32,309 | $71.48 | $2,309,447.32 |

| | | | |
|---|---|---|---|
| 10/19/21 | 9,945 | $75.09 | $746,770.05 |
| | | **TOTAL PROCEEDS:** | **$12,510,239.52** |

20.     Defendant Jared Grusd ("Grusd") served as the Company's Chief Strategy Officer until January 31, 2021, at which point he transitioned to the role of Strategic Advisor. During the Relevant Period, Grusd made the following sales of stock on the basis of material, non-public information:

| Date | Shares Sold | Price | Proceeds |
|---|---|---|---|
| 8/18/20 | 20,122 | $21.97 | $442,080.34 |
| 9/16/20 | 20,750 | $24.68 | $512,110.00 |
| 10/16/20 | 20,550 | $27.68 | $568,824.00 |
| 11/17/20 | 19,885 | $39.01 | $775,713.85 |
| 12/16/20 | 20,482 | $50.96 | $1,043,762.72 |
| 1/19/21 | 20,360 | $50.24 | $1,022,866.40 |
| | | **TOTAL PROCEEDS:** | **$4,365,377.31** |

21.     Defendant Michael J. O'Sullivan ("O'Sullivan") has served as the Company's General Counsel since July 2017. During the Relevant Period, O'Sullivan made the following sales of stock on the basis of material, non-public information:

| Date | Shares Sold | Price | Proceeds |
|---|---|---|---|
| 10/1/20 | 28,000 | $26.28 | $735,840.00 |
| 1/4/21 | 28,000 | $50.44 | $1,412,320.00 |
| 2/26/21 | 31,000 | $65.75 | $2,038,250.00 |
| 3/31/21 | 6,000 | $52.11 | $312,660.00 |
| 4/30/21 | 6,000 | $62.11 | $372,660.00 |
| 5/28/21 | 6,000 | $62.06 | $372,360.00 |
| 6/30/21 | 6,000 | $67.92 | $407,520.00 |
| 7/23/21 | 2,994 | $75.51 | $226,076.94 |
| 7/23/21 | 5,005 | $76.64 | $383,583.20 |
| 7/23/21 | 9,412 | $77.63 | $730,653.56 |
| 7/23/21 | 7,589 | $78.46 | $595,432.94 |
| 7/30/21 | 3,900 | $74.70 | $291,330.00 |
| 7/30/21 | 2,100 | $75.37 | $158,277.00 |
| 8/31/21 | 6,000 | $76.29 | $457,740.00 |
| 9/30/21 | 6,000 | $73.82 | $442,920.00 |
| | | **TOTAL PROCEEDS:** | **$8,937,623.64** |

22.     Defendant Robert Murphy ("Murphy") is a co-founder of Snap and has served as

the Company's Chief Technology Officer and as a member of the Board since May 2012. During the Relevant Period, Murphy made the following sales of stock on the basis of material, non-public information:

| Date | Shares Sold | Price | Proceeds |
|------|-------------|-------|----------|
| 10/22/20 | 1,500,000 | $37.76 | $56,640,000.00 |
| 3/19/21 | 85,485 | $58.54 | $5,004,291.90 |
| 4/26/21 | 950,000 | $59.52 | $56,544,000.00 |
| 7/26/21 | 950,000 | $$75.48 | $71,706,000.00 |
| | | **TOTAL PROCEEDS:** | **$189,894,291.90** |

*Director Defendants*

23.     Defendant Michael Lynton ("Lynton") has served as a member of the Board since April 2013 and has been chairman of the Board since September 2016. He is also a member of the Compensation Committee and the Nominating and Corporate Governance Committee. During the Relevant Period, Lynton, though his company, Lynton Asset LP, made the following sales of stock on the basis of material, non-public information:

| Date | Shares Sold | Price | Proceeds |
|------|-------------|-------|----------|
| 9/9/20 | 151,452 | $24.00 | $3,634,848.00 |
| 9/10/20 | 73,497 | $24.04 | $1,766,867.88 |
| 10/1/20 | 166,786 | $27.00 | $4,503,222.00 |
| 10/5/20 | 58,163 | $27.01 | $1,570,982.63 |
| 10/19/20 | 166,788 | $29.01 | $4,838,519.88 |
| 10/21/20 | 58,161 | $34.98 | $2,034,471.78 |
| | | **TOTAL PROCEEDS:** | **$18,348,912.17** |

24.     Defendant Kelly Coffey ("Coffey") has served as a member of the Board since May 2020. She is also a member of the Audit Committee.

25.     Defendant Joanna Coles ("Coles") has served as a member of the Board since December 2015. She is also a member of the Nominating and Corporate Governance Committee. During the Relevant Period, Coles made the following sales of stock on the basis of material, non-public information:

| Date | Shares Sold | Price | Proceeds |
|---|---|---|---|
| 8/13/20 | 5,027 | $22.00 | $110,594.00 |
| 9/14/20 | 5,418 | $23.66 | $128,189.88 |
| 2/8/21 | 2,438 | $63.39 | $154,544.82 |
| 3/15/21 | 2,317 | $62.50 | $144,812.50 |
| 4/14/21 | 2,201 | $64.16 | $141,216.16 |
| 5/14/21 | 2,091 | $51.36 | $107,393.76 |
| 6/14/21 | 1,986 | $64.57 | $128,236.02 |
| 7/14/21 | 1,887 | $64.53 | $121,768.11 |
| 8/13/21 | 1,792 | $75.29 | $134,919.68 |
| 9/14/21 | 1,993 | $71.75 | $142,997.75 |
| 10/14/21 | 1,893 | $76.88 | $145,533.84 |
| | | **TOTAL PROCEEDS:** | **$1,460,206.52** |

26.     Defendant Liz Jenkins ("Jenkins") has served as a member of the Board since December 2020. She is also a member of the Audit Committee.

27.     Defendant Stanley Meresman ("Meresman") has served as a member of the Board since July 2015. He is also a member of the Audit Committee.

28.     Defendant Scott D. Miller ("Miller") has served as a member of the Board since October 2016. He is also a member of the Compensation Committee and the Audit Committee.

29.     Defendant Poppy Thorpe ("Thorpe") has served as a member of the Board since August 2018. She is also a member of the Compensation Committee and the Audit Committee. During the Relevant Period, Thorpe made the following sales of stock on the basis of material, non-public information:

| Date | Shares Sold | Price | Proceeds |
|---|---|---|---|
| 10/22/2020 | 2,000 | $37.00 | $74,000.00 |
| 10/22/2020 | 4,384 | $37.00 | $162,208.00 |
| | | **TOTAL PROCEEDS:** | **$236,208.00** |

30.     Defendant Fidel Vargas ("Vargas") has served as a member of the Board since July 2021.

31.     Together, Defendants Spiegel, Andersen, Gorman, Hunter, Grusd, O'Sullivan,

Murphy, Lynton, Coles, and Thorpe are referred to herein as the "Insider Trading Defendants."

32.     Collectively, Defendants Spiegel, Andersen, Gorman, Morrow, Hunter, Grusd, O'Sullivan, Murphy, Lynton, Coffey, Coles, Jenkins, Meresman, Miller, Thorpe, and Vargas are referred to herein as the "Individual Defendants."

33.     The Individual Defendants, because of their positions with Snap, possessed the power and authority to control the contents of Snap's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors. Each of the Individual Defendants was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance, and each had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information, each of the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations concerning the Company's financial condition were then materially false and/or misleading.

## SUBSTANTIVE ALLEGATIONS

### Background

34.     Snap describes itself as "a camera company" that is "reinventing the camera" to take advantage of an "opportunity to improve the way that people live and communicate."[1] The Company's flagship product, Snapchat, "is a camera application that helps people communicate visually with friends and families through short videos and images called Snaps."[2]

35.     To enhance various Snapchat features, the Company partners with developers, creators, publishers, and advertisers to "help them create and bring content and experiences into

---

[1] Snap Inc., Annual Report (Form 10-K) (Feb. 4, 2022).

[2] *Id*.

Snapchat, leverage Snapchat capabilities in their own applications and websites, and use advertising to promote these and other experiences to our large, engaged, and differentiated user base."[3]

36.    The Company generates substantially all of its revenue from advertising which, in turn, depends upon Snap's ability to utilize user data.[4]

37.    As noted above, in June 2020, Apple publicly announced a new data privacy feature for its iOS operating system. Rather than truthfully informing investors about the impact that these privacy features would have on its business, Snap continually downplayed the likely effect of the privacy features on the Company's business.

**The Individual Defendants' Materially False and Misleading Statements**

***July 22, 2020 Form 10-Q***

38.    On July 22, 2020, the first day of the Relevant Period, Snap filed with the SEC a quarterly report on Form 10-Q for the period ended June 30, 2020 (the "2Q20 10-Q"), which was signed by Defendants Andersen and Morrow. Attached to the 2Q20 10-Q were certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), signed by Defendants Andersen and Spiegel, attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud.

39.    The 2Q20 10-Q stated the following, in relevant part, regarding the Company's advertising business:

> ***We generate substantially all of our revenues by offering various advertising products on Snapchat***, which include Snap Ads and Sponsored Creative Tools, and measurement services, referred to as advertising revenue.

* * *

---

[3] *Id.*

[4] *See id.*

We sell advertising directly to advertisers ("Snap-sold" revenue) and certain partners that provide content on Snapchat ("media partners") also sell directly to advertisers ("partner-sold" revenue)....

\* \* \*

***We monetize our business primarily through advertising.*** Our advertising products include Snap Ads and Sponsored Creative Tools. We measure our business using ARPU [average revenue per user] because it helps us understand the rate at which we're monetizing our daily user base.

(Emphasis added).

40.    Buried among over a page of general risks regarding advertising, the 2Q20 10-Q

provided only the following generic warning regarding Apple's publicly known privacy change:

Furthermore, changes to iOS or Android operating systems' practices and policies, such as Apple's upcoming iOS update that ***may impose heightened restrictions on our access and use of user data, may reduce the quantity and quality of the data and metrics that can be collected or used by us and our partners***, and adversely affect our ability to effectively target advertisements to users and demonstrate the value of our advertisements to advertisers, any of which could reduce the demand and pricing for our advertising products and seriously harm our business. ***The impact of these proposed changes on the overall mobile advertising ecosystem, our business, and the developers, partners, and advertisers within our community is uncertain*** depending on how these changes are implemented, how we and the overall mobile advertising ecosystem adjusts, and how our partners, advertisers, and users respond, could seriously harm our business. Any adverse effects could be particularly material to us because we are still early in building our advertising business. Our advertising revenue could be seriously harmed by many other factors, including: … changes in our analytics and measurement solutions, including what we are permitted to collect and disclose under the terms of Apple's and Google's mobile operating system, that demonstrate the value of our advertisements and other commercial content; … our inability to collect and disclose data or access a user's Identifier for Advertising or similar deterministic identifier that new and existing advertisers may find useful[.]

(Emphasis added).

***February 4, 2021 Earnings Call***

41.    On February 4, 2021, during the fourth quarter 2020 earnings call, Defendant

Gorman stated the following, in pertinent part, regarding the upcoming Apple update and the

Company's purported commitment to privacy:

> I'll take the IDFA [Apple's Identifier for Advertisers] one first and the 4x growth as you're saying in our down funnel metrics, we're also thrilled to see that. But as it comes to IDFA and the changes, whether or not they will impact us. The reality is we admire Apple, and we believe that they are trying to do the right thing for their customers. ***Their focus on protecting privacy is aligned with our values and the way that we've built our business from the very beginning. So the change here that we're really focused on has less to do with IDFA for which Apple has long offered an opt-out.*** And instead on a much more broad policy change that requires Snapchatters to opt into tracking with other personal identifiers such as their e-mail address, which would make it harder for us and the overall digital ad ecosystem to match advertising outcomes. ***But we've been working really closely with Apple to implement SKAdNetwork, which is their privacy protective solution as well as building our own solutions that use aggregated data to protect privacy. We've been communicating very well with advertisers, we're educating them, talking about them deeply about these coming changes and encouraging them to implement our Conversion API and Measurement Kit to mitigate any of this.*** And then longer term, we're investing in using first-party data from our platform and providing more opportunities for on platform conversion, which will really help. ***Overall, we feel really well prepared for these changes.*** But changes to this ecosystem are usually disruptive and the outcome is uncertain.

(Emphasis added).

***February 5, 2021 Form 10-K***

42.     On February 5, 2021, Snap filed with the SEC its annual report on Form 10-K for the year ended December 31, 2020 (the "2020 10-K"), which was signed by Defendants Andersen and Morrow. Attached to the 2020 10-K were SOX certifications, signed by Defendants Andersen and Spiegel, attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud.

43.     The 2020 10-K stated the following, in pertinent part, regarding the Company's advertising business:

**Our Advertising Products**

We connect both brand and direct response advertisers to Snapchatters globally.

13

Our ad products are built on the same foundation that makes our consumer products successful. This means that we can take the things we learn while creating our consumer products and apply them to building innovative and engaging advertising products familiar to our community.

*AR Ads*: Advertising through Snap's AR tools unlocks the ability to reach a unique audience in a highly differentiated way. Ads can be served as Sponsored Lenses or Sponsored Filters. Lenses are designed through our camera to take advantage of the reach and scale of our augmented reality platform to create visually engaging 3D experiences. Filters are entertaining, artistic overlays that appear after you take a Snap. These Lenses and Filters can be memorialized on Snapchat, through Brand Profiles that aggregate content, filters, and lenses in a single, easy to find place.

*Snap Ads*: We let advertisers tell their stories the same way our users do, using full screen videos with sound. These also allow advertisers to integrate additional experiences and actions directly within these advertisements, including watching a long-form video, visiting a website, or installing an app. Snap Ads include the following:

- Single Image or Video Ads: These are full screen ads that are skippable, and can contain an attachment to enable Snapchatters to swipe up and take action.

- Story Ads: Story Ads are branded titles that live within the Discover section of the Stories tab that can be either video ads or a series of 3 to 20 images.

- Collection Ads: Collection Ads feature four tappable tiles to showcase multiple products, giving Snapchatters a frictionless way to browse and buy.

- Dynamic Ads: Dynamic ads leverage our machine learning algorithm to match a product catalog to serve the right ad to the right Snapchatter at the right time.

- Commercials: Commercials are non-skippable for six seconds, but can last up to three minutes. These ads appear within Snapchat's curated content.

*Campaign Management and Delivery*: **We aim to continually improve the way ads are purchased and delivered. We have invested heavily to build our self-serve advertising platform, which provides automated, sophisticated, and scalable ad buying and campaign management.**

We offer the ability to bid for advertisements that are designed to drive Snapchatters to: visit a website, visit a local business, call or text a business,

14

download an app, or return to an app. ***Additionally, our delivery framework continues to optimize relevance of ads across the entire platform by determining the best ad to show to any given user based on their real-time and historical attributes and activity. This decreases the number of wasted impressions while improving the effectiveness of the ads that are shown to our community. This helps advertisers increase their return on investment by providing more refined targeting, the ability to test and learn with different creatives or campaign attributes in real time, and the dynamics of our self-serve pricing.***

*Measuring Advertising Effectiveness*: ***We offer third-party and first-party solutions to provide a vast array of analytics on campaign attributes like reach, frequency, demographics, and viewability; changes in perceptions like brand favorability or purchase intent; and lifts in actual behavior like purchases, foot traffic, app installs, and online purchases.***

\* \* \*

***We monetize our business primarily through advertising.*** Our advertising products include Snap Ads and AR Ads. We measure our business using ARPU because it helps us understand the rate at which we are monetizing our daily user base.

\* \* \*

*Revenue*

***We generate substantially all of our revenue through the sale of our advertising products***, which primarily include Snap Ads and AR Ads, and measurement services, referred to as advertising revenue. Snap Ads may be subject to revenue sharing arrangements between us and the media partner. We also generate revenue from sales of our hardware products, Spectacles. This revenue is reported net of allowances for returns.

\* \* \*

***We generate substantially all of our revenues by offering various advertising products on Snapchat***, which include Snap Ads and AR Ads, referred to as advertising revenue. AR Ads include Sponsored Filters and Sponsored Lenses. Sponsored Filters allow users to interact with an advertiser's brand by enabling stylized brand artwork to be overlaid on a Snap. Sponsored Lenses allow users to interact with an advertiser's brand by enabling branded augmented reality experiences.

(Emphasis added).

44.    Regarding the Company's purported commitment to the privacy of its users, the 2020 10-K stated, among other things, the following:

**Our Commitment to Privacy**

*Our approach to privacy is simple: Be upfront, offer choices, and never forget that our community comes first.*

We built Snapchat as an antidote to the context-less communication that has plagued "social media." *Not so long ago, a conversation among friends would be just that: a private communication in which you knew exactly who you were talking to, what you were talking about, and whatever you were saying was being memorialized for eternity….*

*When you read our Privacy Policy, we hope that you'll notice how much we care about the integrity of personal communication.* For starters, we've written our Privacy Policy in plain language because we think it's important that everyone understand exactly how we handle their information. Otherwise, it's hard to make informed choices about how you communicate. We've also created a robust Privacy Center where we show that context and choice are more than talking points. *There, we point out the many ways that users can control who sees their Snaps and Stories, and explain how long content will remain on servers, how users can manage the information that we do have about them, and much more.* This is where you'll also find our Transparency Report.

We also understand that privacy policies—no matter how ambitious—are only as good as the people and practices behind those policies. *When someone trusts us to transmit or store their information, we know we have a responsibility to protect that information and we work hard to keep it secure. New features go through an intense privacy-review process—we debate pros and cons, and we work hard to build products we're proud of and that we'll want to use.* We use Snapchat constantly, both at work and in our persona lives, and we handle user information with the same care that we want for our family, our friends, and ourselves.

(Emphasis added).

45.     Again, buried within a risk disclosure indicating that "[t]he failure to attract new advertisers, the loss of advertisers, or a reduction in how much they spend could seriously harm" the Company's business, the 2020 10-K merely stated the following regarding Apple's publicly known privacy change:

Furthermore, changes to iOS or Android operating systems' practices and policies, *such as Apple's upcoming iOS update that may impose heightened restrictions on our access and use of user data, may reduce the quantity or quality of the data and metrics that can be collected or used by us and our partners*, or adversely affect our ability to effectively target advertisements to

users or demonstrate the value of our advertisements to advertisers, any of which could reduce the demand and pricing for our advertising products and seriously harm our business. The impact of these proposed changes on the overall mobile advertising ecosystem, our business, and the developers, partners, and advertisers within our community is uncertain. Depending on how these changes are implemented, how we and the overall mobile advertising ecosystem adjusts, and how our partners, advertisers, and users respond, our business could be seriously harmed. Any adverse effects could be particularly material to us because we are still early in building our advertising business. Our advertising revenue could also be seriously harmed by many other factors, including: … changes in our analytics and measurement solutions, including what we are permitted to collect and disclose under the terms of Apple's and Google's mobile operating systems, that demonstrate the value of our advertisements and other commercial content…our inability to measure the effectiveness of our advertising or target the appropriate audience for advertisements[.]

(Emphasis added).

### July 22, 2021 Earnings Call

46.     On July 22, 2021, during the second quarter 2021 earnings call, Defendant Gorman stated the following, in relevant part, regarding Apple's privacy update and the impact the update was having on the Company:

Our ad platform is being utilized as an effective self-service tool to help advertisers of all types and sizes create, manage, and measure campaigns on Snapchat. ***Further, it is a reflection of our focus on privacy and innovation as we are delivering results for advertisers while also respecting the privacy of our community, which has been a core tenet since we launched ads on Snapchat.*** This year has clearly demonstrated how important it is to simultaneously meet these two objectives for our advertising partners. ***As Apple rolled-out its App Tracking Transparency-related changes near the end of Q2, we observed higher opt-in rates than we are seeing reported generally across the industry, which we believe is due in part to the trust our community has in our products and our business.*** Apple's rollout of the most recent iOS update came later in Q2 than initially anticipated, and the pace of updates by iPhone users has also been slower than we anticipated. ***This has given us more time with advertisers to navigate the transition*** but also means the effects of these changes will come later than we initially expected.

We continue to work with our advertising partners on privacy-safe solutions and other attribution techniques. ***For example, we fully rolled out support of SKAdnetwork version 3.0, which we believe will aid in improving attribution for advertisers who have implemented Apple's API.*** We also launched Advanced Conversions in Ads Manager, which allows advertisers to measure their

campaigns via our privacy-protecting measurement stack. ***We are dedicated to delivering value for our advertising partners while respecting the privacy of our community, as we have worked to do for many years.*** That said, it remains very early in the adoption of the iOS platform changes, and we will continue to learn how these changes may impact our advertising partners, business, and the industry as a whole. We are seeing some initial signals as advertisers test and learn in this new environment and this is causing some interruptions to demand that we had anticipated would be part of the adoption process, particularly in the direct response e-commerce and gaming sectors. It is too early to determine how long it will take until these changes are fully adopted, the scale of the potential interruptions to demand, or the ultimate impact on the longer term growth of our business….

***We continue to invest heavily in video advertising***, with the goal of driving results for our advertising partners and connecting them to the Snapchat Generation. ***For example, we worked with Nielsen to help US advertisers understand how to more effectively reach their target audiences via Snap Ads.*** The Total Ad Ratings (TAR) study analyzed how over thirty cross-platform advertising campaigns reached people on both Snapchat and television. The analysis showed that Snapchat campaigns contributed to an average of 16 percent incremental reach to advertisers' target audiences, and over 70 percent of the Gen Z audience that was reached by Snapchat was not reached by TV-only campaigns. This is especially important as people are increasingly cutting the cord, and mobile content consumption continues to grow, ***presenting us with a large opportunity to help advertisers reach the Snapchat Generation at scale.***

\* \* \*

I think the important thing about IDFA is to really understand that the solutions are not yet fully finalized. Everyone is still evolving, Apple, the entire industry is still evolving. ***And we've said this before, and I just want to reiterate that we genuinely support Apple's approach. We've always believed that advertising should respect customer's privacy at its core at Snap and the products that this amazing team has built for the last almost 10 years now.*** And we've been working really hard to make this transition smooth for our advertising partners as well as our businesses. ***So where we are in the cycle right now is that we rolled out full support of SKAdnetwork version 3.0, which we know will aid or we believe will aid in attribution for advertisers.*** And we've also implemented Apple's API. ***In addition, we launched Advanced Conversions in Ads Manager so advertisers can measure their campaigns with our privacy conscious measurement stack. And then, you know, I think one of the things that we're observing here is that our opt in rates have been above what is sort of widely reported in both the press as well as with the analyst community. So that's, that's good,*** but it remains so early in these iOS changes and there's no question that it will be a change for the industry in and of itself. ***But you know, I think we prepared it the best that we can. The product teams and the engineering teams have been working really closely with all of our partners and our sales teams to***

> ***make sure that this transition for our advertisers is as smooth as possible.***

(Emphasis added).

47.     The statements set forth in ¶¶38-46 were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants failed to disclose to investors that: (1) Apple's privacy changes would have, and were having, a material impact on the Company's advertising business; (2) Snap overstated its ability to transition its advertising given Apple's changes to iOS privacy settings; (3) Snap knew of but downplayed the impact that Apple's privacy changes was having on the Company's advertising business; (4) Snap overstated its commitment to privacy; and (5), as a result of the foregoing, Defendants' public statements were materially false and/or misleading at all relevant times.

**The Truth Emerges**

48.     On October 22, 2021, Snap filed with the SEC its quarterly report on Form 10-Q for the period ending September 30, 2021 (the "3Q21 10-Q"). The 3Q21 10-Q reported disappointing revenue growth and guidance that fell short of estimates, noting that its advertising revenue was hurt more than expected by Apple's updates regarding advertising on mobile applications using its platforms.

49.     Regarding the effects of Apple's privacy updates, the 3Q21 10-Q stated, in relevant part:

> ***[I]n April 2021 Apple issued an iOS update that imposes heightened restrictions on our access and use of user data.*** Google has announced that it will implement similar changes with respect to its Android operating system and major web browsers, like Safari and Chrome, may make similar changes as well. ***These changes have adversely affected our targeting, measurement, and optimization capabilities, and in turn affected our ability to measure the effectiveness of advertisements on our services. This has resulted in, and in the future is likely to continue to result in, reduced demand and pricing for our advertising products and could seriously harm our business.*** The impact of these changes on

19

the overall mobile advertising ecosystem, our competitors, our business, and the developers, partners, and advertisers within our community is uncertain and, depending on how we, our competitors, and the overall mobile advertising ecosystem adjusts, and how our partners, advertisers, and users respond, our business could be seriously harmed. In addition, if we are unable to mitigate these and future developments, and alternative methods do not become widely adopted by our advertisers, then our targeting, measurement, and optimization capabilities will be materially and adversely affected, which would in turn continue to negatively impact our advertising revenue. Any adverse effects could be particularly material to us because we are still early in building our advertising business….

(Emphasis added).

50.     The Company also projected revenue of between $1.165 billion and $1.205 billion for the fourth quarter, well shy of analysts' consensus forecast of approximately $1.36 billion.

51.     On this news, the Company's stock price fell to $19.97 per share (26%) to close at $55.14 per share on October 22, 2021.

## **FIDUCIARY DUTIES**

52.     By reason of their positions as officers and directors of the Company, each of the Individual Defendants owed and continues to owe Snap and its stockholders fiduciary obligations of trust, loyalty, good faith, and due care and was/is required to use his/her utmost ability to control and manage Snap in a fair, just, honest, and equitable manner. The Individual Defendants were/are required to act in furtherance of the best interests of Snap and its stockholders to benefit all stockholders equally and not in furtherance of their personal interest or benefit.

53.     Each Individual Defendant owes and continues to owe Snap, and its stockholders, the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets.

54.     The Individual Defendants, because of their positions of control and authority as

directors and/or officers of Snap, were able to, and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein. Because of their executive and/or directorial positions with Snap, each of the Individual Defendants had knowledge of material, nonpublic information regarding the Company. In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information regarding the Company's business practices, operations, financials, financial prospects, compliance policies, and internal controls so that the market price of the Company's stock would be based on truthful and accurate information.

55.     To discharge their duties, the Individual Defendants were/are required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company. The Individual Defendants were required to, among other things:

a)  ensure that the Company complied with its legal obligations and requirements—including requirements involving the filing of accurate financial and operational information with the SEC— and refrain from engaging in insider trading and other deceptive conduct;

b)  conduct the affairs of the Company in compliance with all applicable laws, rules, and regulations to make it possible to provide the highest quality performance of its business, avoid wasting the Company's assets, and maximize the value of the Company's stock;

c)  remain informed as to how Snap conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make a reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws; and

d)  truthfully and accurately guide investors and analysts as to the business operations of the Company at any given time.

**Duties Pursuant to the Company's Code of Business Conduct**

56.     The Individual Defendants, as officers and/or directors of Snap, were bound by the Company's Global Code of Conduct[5] (the "Code of Conduct"), which claimed that the Company's "standard for good business conduct is not just following the law, it's also treating our stakeholders the right way."[6]

57.     The Code of Conduct emphasized the role of the Company's leaders, listing the following ways to "Be a Kind Leader":

- Discuss the Code with your team and emphasize the importance of doing business in a way that earns the trust of our stakeholders.

- Model kind decision-making by using courage, empathy, and trust to assess whether a decision is a good one.

- Create an environment of psychological safety by encouraging team members to voice concerns and opinions, even if they're different than yours.

- Practice receiving feedback with an open mind.

- Ensure everyone has an opportunity to participate and be heard.

- Practice being vulnerable and self-aware by sharing your own mistakes and learnings with your team.

58.     The Code of Conduct also provided the following information concerning ways for leaders to respond upon learning of a concern:

---

[5] *See* Guide to Kind Business: Snap's Global Code of Conduct (May 13, 2021), https://s25.q4cdn.com/442043304/files/doc_downloads/gov_doc/2021/Code-of-Conduct.pdf.

[6] *Id*.



59.     With regard to avoiding conflicts of interest, the Code of Conduct provided the following information:



60.    Finally, the Code of Conduct set forth, in relevant part, the following rules regarding "Be[ing] Kind to Our Investors":



## Be Kind to
# Our Investors

Our investors trust us by using their resources to back our company. We honor that trust by safeguarding our corporate resources and always operating honestly and fairly.

**TOPICS COVERED:**

Keep Accurate Records and Contracts  >

Make Truthful and Accurate Public Statements  >

Don't Trade on Inside Information  >

Compete Fairly  >

Respect Snap's Property  >

Keep Confidential Information Confidential  >



## Keep Accurate Records and Contracts

Our commitment to honesty is reflected in how we keep business records. Those records come in all shapes and sizes, from receipts to contracts to our user metrics and published financials. Whatever the type of record, we apply the same approach: we are truthful, transparent, and accurate in our documentation. That's the kind of company that investors and the public can trust.

**How We Are Kind**

- We record all business activities accurately and honestly. We do not engage in any activities that would cause those records to be misleading.
- We respect Snap's contracting process. We make sure our contracts accurately portray the agreement and capture all terms of the deal. We don't enter into "side agreements."
- We respect Snap's procurement process and make sure we have the necessary authorization before entering into any agreements or agreeing to any terms on Snap's behalf.
- We always record user metrics, partner metrics, and financial data accurately. We never knowingly falsify, misstate, mischaracterize, or otherwise inaccurately represent those metrics or financials.
- We follow Snap's retention policies when we keep or dispose of documents, data, and communications (see sidebar).
- We immediately notify Integrity & Compliance if we learn of anything that might cause inaccuracies in our public filings.

27

24





61.     The Individual Defendants failed to adhere to the Code of Conduct by allowing

the Company to issue materially false and misleading statements regarding the effect of Apple's

privacy updates on Snap's advertising business. Further, they allowed or failed to prohibit insider trading at the Company.

62.     In addition to these duties, the Audit Committee Defendants, who served on the Audit Committee during the Relevant Period, owed specific duties to Snap under the Charter of the Audit Committee of the Board of Directors (the "Audit Committee Charter").[7] Specifically, the Audit Committee Charter provided for, *inter alia*, the following responsibilities of the Audit Committee Defendants:

**PURPOSE**

The purpose of the Audit Committee of Snap Inc. is to:

- help the Board of Directors oversee Snap Inc.'s corporate accounting and financial reporting processes, systems of internal control, and financial-statement audits;
- manage the selection, engagement terms, fees, qualifications, independence, and performance of the registered public accounting firms engaged as Snap Inc.'s independent outside auditors for the purpose of preparing or issuing an audit report or performing any services;
- review any reports or disclosures required by applicable rules and regulations of the [SEC] and applicable stock exchange;
- oversee the organization and performance of Snap Inc.'s internal audit function; and
- provide regular reports and information to the Board with respect to material issues.

The Audit Committee will maintain and foster an open avenue of communication with Snap Inc.'s management, internal audit, and independent auditors. It will also be responsible for any additional duties and responsibilities that the Board mandates.

\* \* \*

---

[7] *See* Snap Inc. Charter of the Audit Committee of the Board of Directors (May 16, 2019), https://s25.q4cdn.com/442043304/files/doc_downloads/gov_doc/snap-inc-audit-committee-charter-may-2019.pdf.

RESPONSIBILITIES

The Audit Committee will oversee Snap Inc.'s financial-reporting process on behalf of the Board. The independent auditors and any other registered public accounting firm engaged for the financial reporting process will report directly to the Audit Committee and be accountable to it. The Audit Committee's responsibilities are a guide and should remain flexible to account for changing circumstances and needs. The Audit Committee may supplement its duties as appropriate and establish policies and procedures consistent with applicable rules and regulations.

\* \* \*

*Financial Review and Disclosure:*

**5.  Annual Audit Results**. The Audit Committee will review with Snap Inc. management and the independent auditors the results of the annual audit, including:

- the independent auditors' assessment of the quality of Snap Inc.'s accounting principles and practices;

- the independent auditors' views about qualitative aspects of Snap Inc.'s significant accounting practices, the reasonableness of significant judgments, and estimates (including material changes in estimates and analyses of the effects of alternative generally accepted accounting principles ("**GAAP**") methods on the financial statements);

- all known and likely misstatements identified during the audit (other than those the independent auditors believe to be trivial);

- the adequacy of the disclosures in the financial statements; and

- any other matters that the independent auditors must communicate to the Audit Committee under applicable accounting or auditing standards.

**6.  Audited Financial Statement Review; Quarterly and Annual Reports**. The Audit Committee will review the annual audited financial statements and quarterly financial statements with Snap Inc. management and the independent auditors. The Audit Committee will be responsible for recommending to the Board whether the proposed annual audited financial statements should be included in Snap Inc.'s Annual Report on Form 10-K.

**7.  Earnings Announcements**. The Audit Committee will review and discuss with Snap Inc. management and the independent auditors any earnings press releases and other financial information regarding Snap Inc.'s results of operations.

* * *

***Internal Control and Procedures:***

- **Risk Assessment and Management**. The Audit Committee will review and discuss with Snap Inc. management and the independent auditors Snap Inc.'s policies on financial risk management and assessment. The Audit Committee will provide regular reports to the Board about material issues affecting the quality or integrity of Snap Inc.'s financial statements, compliance with legal or regulatory requirements, the performance or independence of the independent auditors, the performance of Snap Inc.'s internal audit function, and other matters as the Audit Committee deems appropriate.

- **Internal Auditors**. The Audit Committee will review the audit plan of Snap Inc.'s Internal Audit team and discuss with that team the adequacy and effectiveness of Snap Inc.'s scope, staffing, and general audit approach. The Audit Committee will review any significant reports prepared by Snap Inc.'s internal auditors, as well as management's response. The head of the internal auditors will also report to and be evaluated by the Audit Committee.

- **Internal Control over Financial Reporting; Disclosure Controls**. The Audit Committee will confer with Snap Inc. management and the independent auditors concerning the scope, design, adequacy, and effectiveness of internal control over financial reporting and Snap Inc.'s disclosure controls and procedures. The Audit Committee will review reports on significant findings and recommendations with respect to internal controls over financial reporting, together with management responses to any special audit steps adopted in light of any material control deficiencies. Periodically, the Audit Committee will meet in separate sessions with the independent auditors, Snap Inc.'s internal auditors, and Snap Inc. management to discuss any matters that any of these parties believe should be discussed privately with the Audit Committee.

- **Correspondence with Regulators**. The Audit Committee will consider and review with Snap Inc. management, the independent auditors, and outside advisors or accountants any correspondence with regulators or governmental agencies and any published reports that raise material issues regarding Snap Inc.'s financial statements or accounting policies.

- **Internal Control Report**. At least annually, the Audit Committee will review a report by the independent auditors describing any material issues raised by (i) that firm's internal quality-control review, (ii) any peer review of the firm's internal quality-control review, or (iii) any inquiry or

investigation by governmental or professional authorities conducted in the last five years of any audit performed by the independent auditors. As part of this annual review, the independent auditors' report will also describe any steps taken to address the issues raised.

- **Complaint Procedures**. The Audit Committee is responsible for overseeing procedures for receiving, retaining, and investigating:

  - complaints received by Snap Inc. regarding accounting, internal accounting controls, or auditing matters and the confidential; and

  - confidential and anonymous submissions by employees concerning questionable accounting or auditing matters.

- **Ethical Compliance**. The Audit Committee will review the results of management's efforts to monitor compliance with Snap Inc.'s programs and policies adhering to applicable laws and rules, including Snap Inc.'s Code of Conduct.

\* \* \*

*Other Matters:*

- **Annual Audit Committee Evaluation**. The Audit Committee will annually evaluate its performance and the adequacy of this charter.

- **Other Legal and Finance Matters**. The Audit Committee will review with Snap Inc. management legal and regulatory compliance and any actual, pending, or threatened legal or financial matters that could significantly affect Snap Inc.'s business or financial statements.

The Committee's responsibility is one of oversight. The members of the Audit Committee are not Snap Inc. employees, and they do not perform management's or any independent auditors' functions. The Audit committee relies on the expertise and knowledge of management, the internal auditors, and any independent auditors in carrying out its oversight responsibilities. Snap Inc. management is responsible for preparing accurate and complete financial statements in accordance with GAAP, crafting periodic reports, and establishing and maintaining appropriate accounting principles and financial reporting policies and satisfactory internal control over financial reporting. The independent auditors will audit Snap Inc.'s annual consolidated financial statements and the effectiveness of Snap Inc.'s internal control over financial reporting and review Snap Inc.'s quarterly financial statements. It is not the Audit Committee's responsibility to prepare or certify Snap Inc.'s financial statements, guarantee the audits or reports of the independent auditors, certify as to whether any independent auditors are 'independent' under applicable rules, or ensure that the

financial statements or periodic reports are complete and accurate, conform to GAAP, or otherwise comply with applicable laws and Snap Inc.'s policies.

(Emphasis in original).

63.     The Audit Committee Defendants failed to adhere to the Audit Committee Charter and the Code of Conduct by issuing false and materially misleading public statements and filings with the SEC regarding the impact of Apple's changes to its iOS privacy settings on the Company's advertising business.

## BREACHES OF DUTIES

64.     The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and/or directors of Snap, the absence of good faith on their part, and a reckless disregard for their duties to the Company.

65.     The Individual Defendants breached their duties of loyalty and good faith by utterly failing to implement a reasonable, relevant, meaningful, and well-constituted system of internal controls, especially with respect to disclosure of material information regarding the impact of Apple's privacy updates on the Company's advertising business as described herein. The Individual Defendants also breached their duties of loyalty and good faith by allowing the Company to cause, or by themselves causing, the Company to make improper statements to the public and the Company's stockholders.

66.     The Audit Committee Defendants had a duty to review the Company's earnings press releases and regulatory filings. The Audit Committee Defendants breached their duties of loyalty and good faith by approving the omission of material information, making the improper statements detailed herein, and failing to properly oversee Snap's public statements and internal control function.

67.     The Individual Defendants, because of their positions of control and authority as

officers and/or directors of Snap, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein. The Individual Defendants also failed to prevent the other Individual Defendants from taking such illegal actions. In addition, because of Individual Defendants' improper course of conduct, the Company is now the subject of the Federal Securities Class Action, which alleges violations of federal securities laws. As a result, Snap has expended, and will continue to expend, significant sums of money.

## DAMAGES TO SNAP

68.     The materially false and misleading statements have exposed Snap to reputational and financial damages, including but not limited to:

> a)  Possible restatements or goodwill impairments;
>
> b)  Liability arising from the Federal Securities Class Action;
>
> c)  Increased director and officer insurance premiums;
>
> d)  The loss of credibility with customers and suppliers; and
>
> e)  Legal costs associated with litigation, investigations, and restatements.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

69.     Plaintiff brings this action derivatively and for the benefit of Snap to redress injuries suffered, and to be suffered, because of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Snap, unjust enrichment, and violations of Section 20(a) of the Exchange Act.

70.     Snap is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

71.     Plaintiff is, and has been, during the Relevant Period, a stockholder of Snap. Plaintiff will adequately and fairly represent the interests of Snap in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to

enforce and prosecute this action.

72.     Plaintiff repeats and re-alleges each allegation stated above as if fully set forth herein.

73.     A pre-suit demand on the Board of Snap is futile and, therefore, excused. At the time of filing this action, the Board consists of 10 directors: (i) Spiegel; (ii) Murphy; (iii) Lynton; (iv) Coffey; (v) Coles; (vi) Jenkins; (vii) Meresman; (viii) Miller; (ix) Thorpe; and (x) Vargas (the "Director Defendants"). Plaintiff needs only to allege demand futility as to half (*i.e.*, five) of the Directors who are on the Board at the time this action is commenced.

74.     Demand is excused as to all of the Director Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme in which they engaged, knowingly or recklessly, to make and/or cause the Company to make false and misleading statements and omissions of material facts, which renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

75.     In complete abdication of their fiduciary duties, the Director Defendants either knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. The fraudulent scheme was intended to make the Company appear more profitable and attractive to investors. As a result of the foregoing, the Director Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

76.     Plaintiff did not make a demand on the Board prior to bringing this action because, for the reasons described herein, there is reason to doubt that at least half of the Board is disinterested with respect to the claims alleged herein because they: (i) received a material

personal benefit from the misconduct; (ii) face a substantial likelihood of liability on the claims alleged herein; and/or (iii) lack independence from someone who received a material personal benefit from the alleged misconduct or who would face a substantial likelihood of liability on the claims alleged herein. *See United Food and Commercial Workers Union v. Zuckerberg*, 262 A.3d 1034, 1059 (Del. 2021) ("*Zuckerberg*").

77.     Demand on Defendant **Spiegel** is futile because Spiegel is the co-founder and CEO of Snap, and has also been a director of the Company since May 2012. Defendant Spiegel personally made materially false and misleading statements and omissions throughout the Relevant Period including in the 2Q20 10-Q and the 2020 10-K. Defendant Spiegel also reviewed, approved, and personally signed and certified Snap's quarterly and annual filings with the SEC including the 2Q20 10-Q and the 2020 10-K. He is also named as a defendant in the Federal Securities Class Action. Defendant Spiegel also received a material personal benefit of nearly $800 million for sales of stock during the Relevant Period. These sales were made between October 2020 and October 2021, while Spiegel was in possession of proprietary adverse material non-public information regarding the true impact of Apple's privacy changes on the Company's primary source of revenue. For these reasons, Murphy received a material personal benefit, breached his fiduciary duties, and faces a substantial likelihood of liability on the claims described herein. Demand upon him is futile and, therefore, excused.

78.     Further, Defendant Spiegel is not disinterested or independent and, therefore, is incapable of considering demand because Spiegel (as CEO) is an employee of the Company who derives substantially all of his income from his employment with the Company. The Company's Form 10-K for the year ending December 31, 2021 admits that Defendant Spiegel is not independent. This lack of independence and the financial benefits he received render Defendant

Spiegel incapable of impartially considering a demand to commence and vigorously prosecute this action against the other Individual Defendants.

79.      Demand on Defendant **Murphy** is futile because Murphy is the co-founder and Chief Technology Officer of Snap, and has been a director of the Company since May 2012. Defendant Murphy also received a material personal benefit of nearly $190 million for sales of stock during the Relevant Period. These sales were made between October 2020 and July 2021, while Murphy was in possession of proprietary adverse material non-public information regarding the true impact of Apple's privacy changes on the Company's primary source of revenue. For these reasons, Murphy received a material personal benefit, breached his fiduciary duties, and faces a substantial likelihood of liability on the claims described herein. Demand upon him is futile and, therefore, excused.

80.      Demand on Defendant **Lynton** is futile because Lynton has served as a Snap director since April 2013. He has received and continues to receive compensation for his role as a director. Defendant Lynton also received a material personal benefit of more than $18 million for sales of stock during the Relevant Period. These sales were made in September and October 2020, while Lynton was in possession of proprietary adverse material non-public information regarding the true impact of Apple's privacy changes on the Company's primary source of revenue. For these reasons, Lynton received a material personal benefit, breached his fiduciary duties, and faces a substantial likelihood of liability on the claims described herein. Demand upon him is futile and, therefore, excused.

81.      Demand on Defendant **Coffey** is futile because Coffey has served as a Company director since May 2020. She has received and continues to receive compensation for her role as a director and has been a member of the Audit Committee during the Relevant Period. For these

reasons, Coffey breached her fiduciary duties and faces a substantial likelihood of liability on the claims herein. Accordingly, demand upon her is futile and, therefore, excused.

82.     Demand on Defendant **Coles** is futile because Coles has served as a Snap director since December 2015. She has received and continues to receive compensation for her role as a director. Defendant Coles also received a material personal benefit of nearly $1.5 million for sales of stock during the Relevant Period. These sales were made between August 2020 and October 2021, while Coles was in possession of proprietary adverse material non-public information regarding the true impact of Apple's privacy changes on the Company's primary source of revenue. For these reasons, Coles received a material personal benefit, breached her fiduciary duties, and faces a substantial likelihood of liability on the claims described herein. Demand upon her is futile and, therefore, excused.

83.     Demand on Defendant **Jenkins** is futile because Jenkins has served as a Company director since December 2020. She has received and continues to receive compensation for her role as a director and has been a member of the Audit Committee during the Relevant Period. For these reasons, Jenkins breached her fiduciary duties and faces a substantial likelihood of liability on the claims herein. Accordingly, demand upon her is futile and, therefore, excused.

84.     Demand on Defendant **Meresman** is futile because Meresman has served as a Company director since July 2015. He has received and continues to receive compensation for his role as a director and has been a member of the Audit Committee during the Relevant Period. For these reasons, Meresman breached his fiduciary duties and faces a substantial likelihood of liability on the claims herein. Accordingly, demand upon him is futile and, therefore, excused.

85.     Demand on Defendant **Miller** is futile because Miller has served as a Company director since October 2016. He has received and continues to receive compensation for his role

as a director and has been a member of the Audit Committee during the Relevant Period. For these reasons, Miller breached his fiduciary duties and faces a substantial likelihood of liability on the claims herein. Accordingly, demand upon him is futile and, therefore, excused.

86.     Demand on Defendant **Thorpe** is futile because Thorpe has served as a Snap director since August 2018. She has received and continues to receive compensation for her role as a director and has been a member of the Audit Committee during the Relevant Period. Defendant Thorpe also received a material personal benefit of approximately $236,000 for sales of stock during the Relevant Period. These sales were made in October 2020, while Thorpe was in possession of proprietary adverse material non-public information regarding the true impact of Apple's privacy changes on the Company's primary source of revenue. For these reasons, Thorpe received a material personal benefit, breached her fiduciary duties, and faces a substantial likelihood of liability on the claims described herein. Demand upon her is futile and, therefore, excused.

87.     Demand on Defendant **Vargas** is futile because Vargas has served as a Company director since July 20, 2021. He has received and continues to receive compensation for his role as a director. For these reasons, Vargas breached is fiduciary duties and faces a substantial likelihood of liability on the claims described herein. Accordingly, demand upon him is futile and, therefore, excused.

88.     In addition, as noted in the Company's most recent Form 10-K, Defendants Spiegel and Murphy "control over 99% of the voting power of [Snap's] outstanding capital stock as of December 31, 2021, and Mr. Spiegel alone can exercise voting control over a majority of [Snap's] outstanding capital stock."[8] Accordingly, Defendants Spiegel and Murphy, or in many

---

[8] Snap Inc., Annual Report (Form 10-K) (Feb. 4, 2022).

instances Defendant Spiegel alone, "have the ability to control the outcome of all matters submitted to [Snap] stockholders for approval, ***including the election, removal, and replacement of [Company] directors***…"[9] Thus, Defendants Lynton, Coffey, Coles, Jenkins, Meresman, Miller, Thorpe, and Vargas lack independence from controlling stockholders and fellow Board members Spiegel and Murphy, both of whom received material personal benefits and face a substantial likelihood of liability on the claims described herein. For this additional reason, demand as to Defendants Lynton, Coffey, Coles, Jenkins, Meresman, Miller, Thorpe, and Vargas is excused as futile.

89.     As trusted Company directors, the above directors conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded their duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded their duties to protect corporate assets. For the above reasons, these Director Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not independent or disinterested, and thus demand upon them is futile and, therefore, excused.

90.     Pursuant to the Company's Audit Charter, the Director Defendants who served on the Audit Committee during the Relevant Period are responsible for overseeing, among other things, the integrity of the Company's financial statements, the Company's compliance with laws and regulations, and the Company's accounting and financial reporting practices and system of internal controls. The Director Defendants who served on the Audit Committee during the Relevant Period – Defendants Coffey, Jenkins, Meresman, Miller, and Thorpe – failed to ensure the integrity of the Company's financial statements and internal controls, as they are charged to

---

[9] *Id*. (emphasis added).

do under the Audit Charter, and allowed the Company to issue false and misleading financial statements with the SEC. Thus, the Director Defendants who served on the Audit Committee during the Relevant Period breached their fiduciary duties, are not disinterested, and demand is excused as to them, in addition to the reasons above.

91.     The Company's Form 10-K for the fiscal year ending December 31, 2021 states that Defendants Lynton, Miller, and Thorpe, while serving on the Compensation Committee during the Relevant Period, approved generous compensation to the Company's executives, even while these persons were causing the Company to issue false and misleading statements and engage in insider sales as outlined herein. The approval of this compensation by Defendants Lynton, Miller, and Thorpe while this wrongdoing was occurring constitutes a breach of fiduciary duty.  Accordingly, these defendants face a substantial likelihood of liability and, for this additional reason, demand is excused as to them.

92.     The Federal Securities Class Action is still pending. Thus, the pendency of the Federal Securities Class Action means it is impossible for the Director Defendants to impartially consider a stockholder demand as to the allegations herein.

93.     In violation of the Code of Conduct, the Director Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including insider trading, breaches of fiduciary duty, unjust enrichment, and violations of Section 20(a) of the Exchange Act. In further violation of the Code of Conduct, the Director Defendants failed to, among other things, comply with laws and regulations, maintain the accuracy of Company records and reports, conduct business in an honest and ethical manner, protect and properly use corporate assets, and properly report

violations of the Code of Conduct. Thus, the Director Defendants face a substantial likelihood of liability and demand is futile as to them.

94.     Snap has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director Defendants have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Snap any part of the damages Snap suffered and will continue to suffer thereby. Thus, any demand upon the Director Defendants would be futile.

95.     The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As all, and if not all at least half, of the Director Defendants face a substantial likelihood of liability and/or received a material personal benefit, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

96.     The acts complained of herein constitute violations of fiduciary duties owed by Snap's officers and directors, and these acts are incapable of ratification.

## COUNT I

**Against the Individual Defendants**
*for Violations of Section 20(a) of the Exchange Act*

97.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

98.     The Individual Defendants, by virtue of their positions with Snap and their

specific acts, were, at the time of the wrongs alleged herein, controlling persons of Snap and officers and directors who made the false and misleading statements alleged herein within the meaning of § 20(a) of the Exchange Act. The Individual Defendants had the power and influence, and exercised same, to cause Snap to engage in the illegal conduct and practices complained of herein.

99.     Plaintiff, on behalf of Snap, has no adequate remedy at law.

## COUNT II

### Against Individual Defendants
*for Breach of Fiduciary Duties*

100.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

101.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Snap's business and affairs.

102.    Each of the Individual Defendants violated and breached their fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

103.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Snap.

104.    In breach of their fiduciary duties, the Individual Defendants caused the Company to engage in the misconduct described herein.

105.    In further breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure, controls, and procedures.

106.    Also in breach of their fiduciary duties, the Individual Defendants willfully or

40

recklessly made and/or caused the Company to make false and misleading statements during the Relevant Period concerning the anticipated impact of Apple's privacy updates on the Company's principal source of revenue.

107.    The Individual Defendants failed to correct and/or caused the Company to fail to rectify any of the wrongs described herein or correct the false and/or misleading statements and omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

108.    The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements. The Individual Defendants either had actual knowledge of the misrepresentations and omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities.

109.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent schemes set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent schemes and fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent

them from continuing to occur.

110. These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

111. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Snap has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

112. Plaintiff, on behalf of Snap, has no adequate remedy at law.

<u>**COUNT III**</u>

**Against Individual Defendants**
*for Unjust Enrichment*

113. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

114. By their wrongful acts, violations of law, false and misleading statements, and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense and to the detriment of Snap.

115. The Individual Defendants either benefitted financially from the improper conduct, received unjust compensation tied to the false and misleading statements, received bonuses, stock options, or similar compensation from Snap tied to the performance or artificially inflated valuation of Snap, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct, or sold stock at artificially inflated prices during the Relevant Period.

116. Plaintiff, as a stockholder and a representative of Snap, seeks restitution from the Director Defendants and seeks an order from this Court disgorging all profits— including benefits, performance-based, valuation-based, and other compensation—obtained by the

Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

117.    Plaintiff, on behalf of Snap, has no adequate remedy at law.

## COUNT IV

### Against the Insider Trading Defendants
*for Insider Trading*

118.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

119.    As alleged above, Anderson, Gorman, Grusd, Hunter, Lynton, Murphy, O'Sullivan, Spiegel, and Thorpe, possessed adverse material non-public information regarding the ongoing impact of Apple's privacy updates on the Company's advertising revenue. The Insider Trading Defendants sold shares for total proceeds of more than $1 billion between July 2020 and October 2021 while shareholders remained unaware of the full truth. They were motivated to do so, in whole or in part, by the possession of adverse material non-public information and they acted with scienter.

120.    When Defendants Anderson, Gorman, Grusd, Hunter, Lynton, Murphy, O'Sullivan, Spiegel, and Thorpe sold their Snap stock, they knew that the investing public was unaware of the adverse material information that they possessed. They also knew that if the information was disclosed, the market price of Snap stock would be significantly lower. The Insider Trading Defendants timed their stock sales to take advantage of the Company's proprietary information and obtain a higher price for the stock they sold. They misappropriated Snap's material non-public information for their own personal gain, to the detriment of the Company and its stockholders.

121.    Plaintiff, on behalf of Snap, has no adequate remedy at law.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

A.      Declaring that Plaintiff may maintain this action on behalf of Snap, and that Plaintiff is an adequate representative of the Company;

B.      Declaring that the Individual Defendants have breached their fiduciary duties to Snap;

C.      Determining and awarding to Snap the damages sustained by it because of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre- and post-judgment interest thereon;

D.      Directing Snap and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and protect Snap and its stockholders from a repeat of the damaging events described herein;

E.      Awarding Snap restitution from Individual Defendants;

F.      Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

G.      Granting such other and further relief as the Court may deem just and proper.

Dated: April 6, 2022                          Respectfully submitted,

                                              **BIELLI & KLAUDER, LLC**

                                              */s/ Ryan M. Ernst*
                                              Ryan M. Ernst (No. 4788)
                                              1204 N. King Street
                                              Wilmington, DE 19801
                                              (302) 803-4600
                                              rernst@bk-legal.com

**LEVI & KORSINSKY, LLP**
Gregory M. Nespole
Daniel Tepper
Correy A. Kamin
55 Broadway, 10th Floor
New York, NY 10006
T. 212.363.7500
F. 212.363.7171
gnespole@zlk.com
dtepper@zlk.com
ckamin@zlk.com

*Attorneys for Plaintiff Vonmarie Thomas*